STEPHEN G. ALLEN *vs.* MOSES A. HERRICK & another.
SAME *vs.* CHARLES W. CARTWRIGHT.

A manufacturing corporation verbally agreed with a person, who had lent to them about $32,000, that he should increase his loan to $40,000, that the corporation should issue to him that amount of special stock under *St.* 1855, *c.* 290, redeemable in five years, and give him a separate agreement to redeem $30,000 in three years, and that their president should be individually liable. The creditor received from the corporation a certificate of special stock to the amount of $40,000, redeemable in five years, and entitled to half-yearly dividends, a written agreement of the corporation to redeem $30,000 of it in three years, and a separate agreement of the president to "guaranty the payment to him of the $30,000 of special stock mentioned in" the agreement of the corporation; and afterwards received from the corporation in cash one dividend on the special stock, and notes of the corporation, indorsed by the president individually, for subsequent dividends. Before the expiration of the three years the corporation and the president became insolvent, and simultaneously instituted proceedings in insolvency. *Held,* that the creditor could not prove against the estate of either any claim except on the notes given for dividends.

APPEALS by the assignees of the Boston Steam Engine Company, and of Otis Tufts, from orders of the judge of insolvency, allowing the plaintiff's claims against the estates of both. The cases were tried together before *Merrick*, J., and by him reported for the determination of the full court, in substance as follows :

Before the passage, on the 3d of May 1855, of the *St.* of 1855, *c.* 290, authorizing the issue of special stock by manufacturing corporations, the Boston Steam Engine Company were organized and doing business as a manufacturing corporation, of which Tufts was the president, the owner of about three quarters of the stock, and the only stockholder who was possessed

of considerable property. After the passage of that statute, their officers, contemplating obtaining additional capital by the issue of a special stock, had a negotiation with the plaintiff which resulted in the acceptance of a proposition made by him, and reduced to writing thus : "Stephen G. Allen's proposition. 1st. To take $10,000 new stock at eight per cent. 2d. To lend us $30,000, and perhaps $40,000, for three years, taking new stock as his security, at ten per cent. interest. 3d. To give us the privilege of paying up this $30,000 any time before the 1st of January 1856, if we can get the stock taken up, but first to offer it to him to take, if he chooses. 4th. To give us part notes for the $30,000 or $40,000, which notes shall be paid at maturity, and interest to be allowed, making them to us the same as cash." At that time the plaintiff held notes of the corporation for borrowed money to a certain amount, and afterwards, and before the issue of the special stock, lent them a fur-. ther amount.

In June 1855 the treasurer of the corporation told the plaintiff that the above arrangement could not be carried out in that form, as he had learnt that the special stock could not be originally issued to him by the corporation as collateral security; but, what would be the same thing in effect, the corporation would issue to him the $40,000 stock absolutely, redeemable in five years, and give him a separate agreement to redeem $30,000 thereof in three years, and that Tufts would be individually liable. To this modification the plaintiff assented, and on or about the 28th of July 1855 a computation was made of the sums due to the plaintiff, then amounting to nearly $32,000, and of the balance to make up $40,000, as cash on the 16th of June 1855. On the 4th of August 1855 the plaintiff gave up to the corporation their notes, and gave them his notes for the balance, signed a subscription book for four hundred shares of special stock, and received from the corporation certificates of special stock to the amount of $40,000, all dated June 16th 1855, for which he receipted in the certificate book of special stock as of that date. The plaintiff contended that the *St.* of 1855, c. 290, was unconstitutional, and that the meeting

at which the corporation voted to issue this stock was not duly called, upon grounds not now material to be stated.

These certificates were in the usual form of certificates of general stock of manufacturing corporations, with the addition of the following words stamped crosswise on their face in red ink : " Special stock. $100 per share, subject to redemption at par after five years, and entitled to a fixed halfyearly dividend of four per cent."

At the same time the following agreement was executed and delivered between the parties : " Memorandum of agreement made this twenty-eighth day of July A. D. 1855, between the Boston Steam Engine Company, of Boston, county of Suffolk, and Commonwealth of Massachusetts, and Stephen G. Allen, of Somerville, county of Middlesex, and commonwealth aforesaid, witnesseth, that whereas the said company voted on the thirtieth day of June last, at a meeting regularly called for that purpose, to increase their capital stock in the sum of one hundred thousand dollars ; said increase being special stock, and redeemable at par in five years, and entitled to a fixed halfyearly dividend of four per cent. ; and whereas said company have solicited said Allen to subscribe towards said special stock, and in accordance with their solicitations he has subscribed towards the same, to the amount of forty thousand dollars, thirty thousand of which is subscribed with the understanding that the same shall be redeemed in three years from the date of said stock, instead of five years, as aforesaid. Now therefore, in consideration of the premises, the said company agree that they will redeem the said amount of thirty thousand dollars of special stock in three years from the date thereof. Witness our hands and seals the day and year before written. Stephen G. Allen. [seal.]
" Approved, L. A. Bigelow, Treas. [seal.]
" Otis Tufts, President. Boston Steam Engine Co."

In the fall of 1855, the plaintiff becoming uneasy as to his security, Tufts made and delivered to him this guaranty, and at the same time received from him one dollar as a consideration therefor : " In consideration of the payment of one dollar paid to me by S. G. Allen of Somerville, I hereby guaranty the

payment to him of the thirty thousand dollars of special stock mentioned in an agreement between him and the Boston Steam Engine Company, dated July 28th 1855, the said sum being a part of the forty thousand dollars mentioned in said agreement. Boston, 20th November 1855. Otis Tufts."

The plaintiff on the 1st of October 1855 received from the corporation in cash a dividend on the special stock, and afterwards received for the amount of two other such dividends promissory notes of the corporation, indorsed by Tufts, payment of which was duly demanded at maturity and refused, and notice thereof given to Tufts.

On the 26th of September 1856 the corporation and Tufts filed petitions for the benefit of the insolvent laws, upon each of which a warrant was issued, and due notice of its issue published the next day.

On the 23d of October 1858, the treasurer of the corporation being then absent in Europe, the plaintiff handed to Tufts a written demand on the corporation for the execution of their agreement.

*H. Gray, Jr.*, for the plaintiff. I. The power of the corporation to contract debts is not limited by *St.* 1855, *c.* 290. Without regard to the question of the validity of the special stock, the agreement to redeem $ 30,000 in three years from the 16th of June 1855 was valid. It was an absolute promise to pay a certain sum of money at a future time fixed, and therefore provable in insolvency against the corporation, although the time of payment did not arrive until after the first publication of notice. *St.* 1851, *c.* 327, § 3. *St.* 49 G. 3, *c.* 121, § 9. *Clayton* v. *Gosling*, 5 B. & C. 360. *Ex parte Elgar*, 2 Glyn & J. 1. *Ex parte Dowman*, 2 Glyn & J. 241. *Ex parte Coming*, 9 Ves. 115. But if this stipulation to redeem at a time different from that expressed in the certificates is illegal and not binding on the corporation, then the whole agreement, (of which this constituted an essential part,) is not binding on the plaintiff, and he may deliver up his certificates of special stock, and prove for the amount of the original loan. *Walker's case*, 8 De Gex, Macn. & Gord. 607. *Stedman* v. *Gooch*, 1 Esp. R. 5. *Ex parte Black*

*burne,* 10 Ves. 204. *Manufacturers & Mechanics' Bank* v. *Gore,* 15 Mass. 79. *Episcopal Charitable Society* v. *Episcopal Church in Dedham,* 1 Pick. 373, 374. *Zerrano* v. *Wilson,* 8 Cush. 424.

If the special stock was legally issued, it constituted a debt of the corporation for $40,000, (the amount of the special stock at par,) payable at a fixed time expressed in the certificate, and dividends on which were payable halfyearly, of a certain amount, even if part of the capital should be required for the purpose, and is therefore provable against the corporation.

Whether the special stock is valid or not, the plaintiff, having taken it only as collateral security for his loan to the corporation, may surrender it to their assignees, and prove against the corporation on his original loan. *St.* 1851, *c.* 327, § 3. If the agreement to redeem in three years and the issue of special stock are both void, he is entitled to prove for the whole loan of $40,000. *Cases above cited.* If the agreement to redeem in three years is valid, and the issue of special stock void, he may prove for $10,000 of the loan. The acts of the plaintiff in receiving certificates of special stock and dividends cannot estop him to deny that no special stock was ever legally created by the corporation. *Oldtown & Lincoln Railroad* v. *Veazie,* 39 Maine, 582, 583. *Whittenton Mills* v. *Upton,* 10 Gray, 582. *Trustees of Free Schools in Andover* v. *Flint,* 13 Met. 543.

II. The plaintiff's claim upon Tufts was a " debt absolutely due " at the time of the first publication of notice, within the meaning of the *St.* of 1838, *c.* 163, § 3. It may well be held to have been an absolute debt of Tufts, when it was contracted, notwithstanding the fact that there was another party primarily liable for the debt. It was well settled, in England, that the liability of an indorser of a promissory note, or bill of exchange, was a " debt growing due," within the meaning of the insolvent acts of 12 G. 3, *c.* 23, § 27, and 41 G. 3, *c.* 70, § 34; or, as Lord Mansfield said, " *debitum in præsenti, solvendum in futuro,*" and did not " depend upon a contingency." *Workman* v. *Leake,* Cowp. 22. *Sharpe* v. *Iffgrave,* 3 Bos. & Pul. 394. If the liability of an indorser, who is entitled, at all events, to strict

notice of the default of his principal, is held absolute before such default and notice, much more that of a guarantor, who is not entitled to notice, unless necessary to protect him from loss. But the liability of Tufts, if not absolute when it was contracted, had since become absolute; for the corporation, by taking the benefit of the insolvent laws, had made the performance of their contract with the plaintiff impossible, and had dispensed with the necessity of any demand upon them or notice to the defendants.

If no action can be maintained or proof made against the corporation, on the agreement to redeem $ 30,000 of the special stock in three years, the promise of Tufts that that amount shall. be paid then is not the less binding on Tufts, who was not re-- strained by law from making such a stipulation, and is estopped, to deny the corporation's signature and legal capacity to contract. *Veazie* v. *Willis,* 6 Gray, 92. *Prescott Bank* v. *Caverly,* 7 Gray, 220. Chit. Con. (8th Amer. ed.) 436. 1 Parsons on Con. 493, 494. If the corporation are not bound, the undertaking of Tufts for the payment of the $ 30,000 is original and not collateral. *Dole* v. *Young,* 24 Pick. 252. *Duval* v. *Trask,* 12 Mass. 156. *Tileston* v. *Newell,* 13 Mass. 406. *Edge* v. *Frost,* 4 D. & R. 243, 245.

III. The promissory notes for dividends, made by the corporation, and indorsed by Tufts, having been duly protested for nonpayment, and notice thereof given to Tufts, are clearly provable against both estates. *Sts.* 1838, *c.* 163, § 3; 1851, *c.* 327, § 3. *Sohier* v. *Loring,* 6 Cush. 537.

*A. H. Fiske & J. L. English,* for the assignees of the corporation.

*C. B. Goodrich,* for the assignee of Tufts.

BIGELOW, J.* I. It is quite immaterial to the decision of these cases to consider what would have been the rights and obligations of the parties under the executory agreements of May 1855. Its stipulations were found to be inconvenient and impracticable, and were abandoned by mutual consent. Nor is the fact of any importance, that the plaintiff began his transactions with

* HOAR, J. did not sit in these cases.

the corporation by lending them money, and thereby became their creditor to a large amount. Whatever may have been the nature of the previous dealings between the parties, or their relations arising therefrom, they were all merged in the agreement of June 1855, which the parties then proceeded to carry out and execute, and which was in force at the time of the commencement of the proceedings in insolvency against the corporation. It is on the validity, construction and effect of this agreement that the decision of the questions raised in the first of these cases must depend.

In the first place, we think it very clear that the plaintiff cannot claim under this agreement to prove against the estate of the corporation for a loan of forty thousand dollars. Looking at the transaction, as we are bound to do, solely in the light of the written documents in which the contract of the parties is expressed, irrespectively of their previous dealings and verbal agreements, we can see in it none of the characteristics of a loan. The plaintiff did not lend the sum of forty thousand dollars to the corporation upon their promise to repay him that sum absolutely as a debt at a fixed period of time, with lawful interest thereon. He subscribed for four hundred shares in the capital stock of the corporation, which they agreed to redeem at par at certain specified times, and to pay thereon a "fixed half-yearly dividend of four per cent." He received certificates of special stock, purporting to be issued in due form according to *St.* 1855, *c.* 290, for which he paid partly in notes of the corporation held by him for money previously lent to them, and partly in his own notes. But there was no agreement that this payment, or any part of it, should be considered in the light of a loan, or that the stock should be held as collateral security for the money paid therefor. Indeed it would be impossible to regard this transaction as a loan of money, without setting aside the express stipulations and agreements of the parties, and treating them, not as *bona fide* contracts fairly entered into, but only as a mere form adopted for the purpose of covering up the true character of their dealings with each other. There are no facts disclosed in the case to justify the inference that the parties

intended to enter into any contract different from that expressed in the written documents, and if they did, it would not alter the legal effect resulting from their true interpretation, which was that the plaintiff thereby became a holder of four hundred shares of special stock, with the rights and liabilities consequent on that relation, and not a creditor of the corporation by a loan to the amount of the par value of such shares.

The question then arises whether, assuming the transaction to have been in all respects valid and the stock duly issued, the plaintiff as such special stockholder can claim to stand in the position of a creditor entitled to prove the agreement of the corporation to redeem the special stock at par, as a debt against their estate in competition with their general creditors? We think that he cannot. It is doubtful whether such an agreement can be regarded as a debt provable against an insolvent estate under the *Sts.* of 1838, *c.* 163, § 3, and 1851, *c.* 327, § 3. It is rather an executory agreement to do a collateral act, and not a promise to pay a fixed sum as a present debt at a future time, *debitum in præsenti solvendum in futuro.* Under the English bankrupt laws, a claim for damages not liquidated and ascertained at the time of the commencement of proceedings in insolvency does not constitute a debt provable against an insolvent estate, although the right to recover thereon is founded on a contract or promise; and it is held that it does not make any difference that the damages are susceptible of accurate computation, and that the elements by which to ascertain and fix the amount of such damages are furnished by the contract itself. The agreement is nevertheless executory in its character, to perform some act or pay money, not as a present existing debt or duty, but as a future liability or obligation to arise or grow out of the contract. *Yallop* v. *Ebers,* 1 B. & Ad. 698. *Atwood* v. *Partridge,* 4 Bing. 209. *Toppin* v. *Field,* 4 Ad. & El. N. R. 386. Such seems to have been the nature of the agreement entered into between the plaintiff and the corporation.

But the more decisive objection to the proof of the plaintiff's claim is, that it would violate the manifest intent and policy of the *St.* of 1855, *c.* 290, by which the issue of special stock is

authorized, to treat it as a debt of the corporation, entitling the holder to a share in the assets *pari passu* with other creditors. The purpose of this statute was not to enable the corporation to contract debts. They had ample power to do that, without any additional legislative enactment. The manifest object was to enable the corporation to increase their capital, and thereby to add to their means of transacting business, and to enlarge the assets from which their creditors might be paid. To this end it authorized the issue of shares which should entitle the holders to certain rights and privileges by way of preference over the general stockholders, and should subject them to a much more limited liability. To effect the latter purpose it provided that the holders of special stock should "in no event be liable for the debts of the corporation beyond their stock." This clearly implies that such stockholders are not to become creditors of the corporation to the amount of their special stock, but in a certain sense and to a limited amount debtors, and liable in certain contingencies to the extent of the value of their shares to the general creditors of the company. The relation thus created by the statute between the general and special stockholders is not un like that between general and special partners under the Rev. Sts. *c.* 28, the former being liable for all the debts of the copartnership, and the latter only to the extent of the amount of capital contributed by them to the common stock. If this analogy is correct, it would seem quite decisive of the question before us, for it would hardly be contended that special partners could prove a claim for the amount of capital contributed by them, as a debt against the estate of the copartnership in competition with the creditors of the firm. Indeed if the special stock is regarded as a debt due from the corporation to the holders in proportion to the number of shares held by them respectively, the chief practical effect of the statutes would be to empower manufacturing corporations to borrow money at a rate of interest greater than that allowed to be paid on ordinary contracts. It would not enlarge their capital or increase the assets out of which to pay their debts, because their direct liability would be increased to the full extent of the capital contributed by the special stock-

holders. Such was not the result contemplated by the framers of the statute. The holders of the special stock were to stand in the relation of stockholders to the corporation and the creditors of the corporation, and were entitled to no rights or immu nities over the general stockholders other than those specifically enumerated in the act. Among them, according to any reasonable interpretation of the statute, was not included the right to claim the amount of their stock as a debt against the corporation, which is entitled to be proved against their estate to the diminution of the assets to which the general creditors would be entitled.

These considerations apply with equal force to the special agreement by which the corporation agreed to redeem in three years thirty thousand dollars of the special stock issued to the plaintiffs. If such special agreement was valid and in conformity with the provisions of *St.* 1855, *c.* 290, it cannot be regarded as a debt provable against the estate of the corporation, for the reasons already given.

But it is contended by the plaintiff that both agreements were invalid, and that the corporation never duly authorized the issue of any special stock. On this ground it is claimed that he has a right to surrender and deliver up his certificates of special stock, and prove for the amount of money paid by him therefor. We do not deem it necessary to decide whether the proceedings of the corporation were so conducted as to render the issue of special stock legal and valid, or whether there was any authority in the officers to execute the special agreement of June 28th 1855 for the redemption of thirty thousand dollars of the special stock in three years. Assuming that the whole transaction was unauthorized and illegal, and for that reason not binding on the corporation, we are of opinion that the plaintiff is not entitled to prove his claim against the estate of the corporation in insolvency. The plaintiff, in pursuance of the contract with the corporation, has received not only certificates of shares which he alleges to be worthless, but he has received one dividend thereon in cash and two notes of the corporation, indorsed by a third person, for other dividends. On this state of facts, what

were the rights of the plaintiff at the time of the first publication of notice of the proceedings in insolvency? If the contract was invalid, so that he had a right to treat it as null and void, he then had a good cause of action against the corporation to recover damages sustained by him in consequence of their illegal or unauthorized acts. But this clearly was not a claim which could be proved as a debt against the estate of the corporation in insolvency. He had no claim to recover back the money, which he had paid under the contract, as money had and received, because he had never rescinded the contract. It was not a case where a party under a void contract had received in exchange for money only worthless paper or articles of no value. The plaintiff had received, under his contract with the corporation, moneys and notes which were of value. If he had seen fit to rescind the contract and to demand back the money which he had paid for the special stock, it would have been necessary for him to do some act declaring his purpose of rescission, and also to surrender all that he had received under it, as a condition precedent to his right of action to recover back the money. But he had made no election to rescind, and had tendered back neither the money nor notes which he had received under the contract, at the time of the first publication of notice of proceedings in insolvency, so that then he had no subsisting cause of action to recover back money, as money had and received upon a contract which had failed. *Conner* v. *Henderson*, 15 Mass. 319. *Holbrook* v. *Bent*, 22 Pick. 546.

We are therefore of opinion that the plaintiff is entitled to prove against the estate of the corporation only the amount of the two notes given for dividends on the special stock, to which no objection is made, and that he cannot prove for the amount paid by him for the special stock in the corporation, or any part of it.

II. The only ground on which the plaintiff claims to prove against the estate of Tufts under the agreement of November 20th 1855 is, that it created a " debt absolutely due " from him at the time of the first publication of the notice of issuing the warrant against his estate, " although not payable until after-

wards," within the true intent and meaning of *St.* 1838, *c.* 163, § 3. If it was an executory contract for the performance of a future act, not creating a present debt, or if it was a collateral undertaking or promise to pay a certain sum in a certain event or contingency, then it is clear it could not be proved as a debt absolutely due at the time the proceedings in insolvency were commenced.

The terms of the agreement in the present case are unambiguous. The language is precise and definite, and the intention of the parties to the contract is clear and intelligible. The contract by Tufts was to "guaranty the payment" to the plaintiff of the thirty thousand dollars of special stock issued by the corporation. The word "guaranty" naturally imports that another person is primarily liable to perform an engagement. In its legal and technical sense, a contract of guaranty is a collateral undertaking to answer for the debt or stipulations of another person, as distinguished from an original, direct, and absolute engagement for the party's own act. It is of the essence of the contract that there should be some one liable directly to perform some act or duty, and by performance to extinguish all obligation of the guarantor. Therefore a guaranty of the debt of another is an agreement to pay it in case he does not. *Dole* v. *Young*, 24 Pick. 252. The liability of a guarantor is not fixed and absolute until the party primarily liable on the contract has failed to perform it. Until such failure, the obligation of the guarantor is strictly collateral and contingent, and this constitutes the chief distinction between a contract of guaranty simply and that of principal and surety. In the latter case, the surety is directly liable on the contract, and may be sued as promisor; in the former case, the guarantor is not liable until the failure of the person primarily responsible to perform his contract, and can be held only on his special promise to pay if the other party does not. *Oxford Bank* v. *Haynes*, 8 Pick. 428. Fell on Guar. 1.

The intention of the parties in the present case conformed to the language of their written contract. It was not their purpose that Tufts should be liable in the first instance and at all events

upon his contract. The legal duty and liability of redeeming in three years the special stock issued to the plaintiff was on the corporation, and by their written agreement they stipulated for its redemption and payment accordingly. Tufts was not personally liable for the contracts of the corporation. He had no interest in making the agreement with the plaintiff beyond that of a general stockholder to a large amount in the corporation, desirous of promoting the success of their business by procuring greater facilities consequent on an increase of their capital stock. But he did not intend to borrow money for them on his own direct promise, or become liable as surety for the payment of their debts. Strictly speaking, there was no debt due to the plaintiff from the corporation. There was no promise by them to pay at a future time a fixed sum of money as a present existing indebtment, but only an agreement to do a certain act, collateral in its nature, at a future day, to be performed by the payment of a sum of money computed according to a fixed and definite standard established by the contract. It was the performance of this contract, which Tufts, the insolvent, guarantied; not that he would in the first instance, as an absolute engagement by himself, perform the agreement by redeeming the stock, but that he would do so in the event that the corporation should fail to make the redemption according to the terms of their stipulation with the plaintiff. In this view, it is very clear that there was no debt due, in any legal sense, from the insolvent when the proceedings in insolvency were commenced. There was only an executory agreement for the performance of an act in a certain contingency or event.

But it was urged in behalf of the plaintiff that although, in its inception, the contract or agreement of Tufts might have been collateral and contingent, it had become absolute at the time of the first publication of the notice of the insolvency, because the corporation had then surrendered their property under the insolvent laws, and had thereby made the performance of their contract by themselves impossible. But it would be going quite too far to say that the nature of the contract was changed by the mere insolvency of the party primarily liable, and that

thereby a collateral and contingent liability was changed into a direct and absolute one. It cannot be assumed, as a general rule, that the commencement of proceedings in insolvency by a corporation or individual renders the full payment of their debts and the performance of all their executory contracts impossible. Such is not the practical result in all cases. It may be true that, in the present case, the event has proved the inability of the corporation to fulfil their agreement with the plaintiff. But this result could not have been positively foretold at the time of the commencement of the insolvent proceedings. It may have been probable, but was not certain. There was then the contingency or possibility that before the maturity of the contract for the redemption of the stock, the assets of the corporation might prove sufficient to discharge all their debts and liabilities; or, as is often done after the commencement of proceedings in insolvency, that some arrangement might be made with their creditors for an extension or reduction of their immediate and present liabilities, and a consequent stay and discharge of all further proceedings in insolvency by an application to the equity jurisdiction of this court. It cannot therefore be said with truth that the performance of the contract by the corporation, when the proceedings in insolvency were commenced, was rendered impossible. It could not then have been properly adjudged that the contract of the corporation with the plaintiff would not be performed at its maturity, and that thereby the claim under the guaranty against the estate of Tufts had ceased to be contingent, and was entitled to proof as a debt absolutely due.

Nor are we able to see that the character of the contract of Tufts was materially changed by the supposed illegality of the agreement of the corporation with the plaintiff to redeem a portion of the special stock issued to him in three years. It is very questionable whether, on the facts proved, the plaintiff can be permitted to set up this illegality, and avail himself of it as the foundation of his claim to charge the estate of Tufts with a debt absolutely due, which he had agreed to take only as a collateral and contingent engagement. Having taken the shares of special stock under the agreement, and received divi-

dends thereon, which he still retains, it certainly is not equitable for him now to seek to set aside the contract as illegal. But assuming that the contract was unauthorized, and such as the corporation could not have properly entered into, it was not absolutely void. It was only voidable. The corporation or the stockholders, or their legal representatives, might avoid it. But they had a right to regard it as binding and to fulfil its stipulations, and, unless they elected to avoid it, it may well stand good as against them. It does not appear that the corporation or their assignees have ever objected to its validity. Nor had the plaintiff, at the time of the commencement of the proceedings in insolvency, done any act to rescind the contract, or to claim against the corporation otherwise than under the contract as a valid and binding agreement in all its parts. At that point of time therefore the validity of the contract had not been called in question by either party. It was not then void, but only voidable, and it was wholly uncertain whether any objection to its validity would ever be made.

Under the English bankrupt acts, enacted prior to *St.* 6 G. 4, *c.* 16, the provisions of which resemble in many particulars those of our own insolvent laws, a contract of guaranty similar in legal effect to the one under consideration in the present case was held not to be provable before the maturity of the contract against the estate of the guarantor. This was early settled in *Ex parte Adney*, Cowp. 460, and has not since been controverted in the English courts. In that case a person, for a valuable consideration, undertook in writing to guaranty the payment of a promissory note to the holder. Before the note became due, the guarantor became himself bankrupt. It was held that this undertaking of guaranty was intended as a collateral engagement only, and could not be proved by the holder against the estate of the guarantor, as it rested in contingency.

It is true that under the insolvent acts of 12 G. 3, *c.* 23, § 27, and 41 G. 3, *c.* 70, § 34, it has been held that the liability of an indorser on a promissory note or bill of exchange was, in the language of those acts, "a debt growing due." There is no such phrase in our insolvent act, descriptive of debts provable.

But it is very clear that such a liability was not intended to be included in our statute as a debt absolutely due, though not payable; because provision is specially made for the proof of claims arising in consequence of the debtor's "having made or indorsed any bill of exchange or promissory note" before the commencement of the insolvent proceedings. A similar provision was incorporated in the English bankrupt system by *St.* 7 G. 1, *c.* 31.

Upon the ground that the plaintiff's claim under the agreement of November 1855 cannot be regarded as a debt absolutely due from the estate of Tufts at the time of the commencement of the insolvent proceedings, we are of opinion that proof of it must be disallowed, and the plaintiff admitted to prove only the two notes on which Tufts was the indorser.

*Judgment accordingly.*